**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **DIANA GONDEAU-GUTTU** | ) | CASE NO. 1:24-cv-00175 |
|  | ) |  |
| *Plaintiff,* | ) |  |
|  | ) | JUDGE DAVID A. RUIZ |
| v. | ) |  |
|  | ) |  |
|  | ) |  |
| **DLR GROUP, INC.,** *et al.* | ) | **PLAINTIFF GUTTU'S BRIEF IN** |
|  | ) | **OPPOSITION TO DEFENDANTS'** |
| *Defendants.* | ) | **MOTION FOR SUMMARY** |
|  | ) | **JUDGMENT** |

*The timeline in this case speaks for itself.*

Plaintiff Diana Gondeau-Guttu ("Diana'") was diagnosed with breast cancer on January 9, 2023. At the time of her diagnosis, Diana had been with DLR[1] for close to 5 years, working as a Financial Administrator, and had not received any previous performance write-ups or otherwise disciplined for any performance issues. On January 16th, she advised her Manager, Aisha Khan, of her cancer diagnosis and that she would be missing work due to her upcoming surgeries and radiation treatment. Khan then told her supervisor, Rebecca Schnack, DLR's Chief Financial Officer, of Diana's illness and upcoming medical-related FMLA leave. Approximately 2 months later, DLR terminated Diana.

Schnack made the decision to terminate Diana. Once Schnack and DLR became aware of Diana's illness and need for medical leave under the FMLA for her expensive cancer treatment, they commenced a hasty campaign toward termination. DLR is a self-insured employer, and

---

[1] Defendants DLR Group, Inc.; DLR Holding Company; and DLR Group Services, Inc., is referred to collectively as "DLR".

Diana participated in DLR's self-funded health insurance plan. Under DLR's stop-loss insurance policy, the required deductible for each covered employee, like Diana, was $200,000.

On February 2nd, Khan and Schnack threatened Diana with termination claiming an alleged formal complaint had been filed against her by a new employee who had only been with the company approximately 10 days. On or around February 9th, some *unidentified* DLR employee, out of the blue, allegedly made a passing comment to DLR's Chief Human Resources Officer, Molly Johnson, that "our financial advisor in Cleveland" had a criminal background. Johnson alerted in-house counsel on February 10th that Diana had a previous criminal matter 15 years prior. That same day, Diana advised HR that she would have to undergo several surgeries with intermittent absences and inquired about FMLA leave.

Three days later, on February 13th, DLR attempted to fault Diana for making a misrepresentation of fact during the hiring process about her criminal background. However, DLR had never asked Diana whether she had any criminal background and apparently had not performed any type of background check.

On February 16th, Diana applied for FMLA leave with an anticipated return-to-work date of March 8, 2023. Diana underwent her first cancer-related surgery on February 22nd. In early March, Diana shared with Khan and her co-workers that she would need to undergo chemotherapy and radiation therapy and have additional surgeries. Although Diana was unable to return to the office on March 8th due to her continuing cancer treatment, she performed her job duties while working from home when she had breaks from her treatment. On March 24th, Diana advised two members of upper management that her absence from the office was due to her breast cancer treatment and requested a temporary work-from-home accommodation, to which no response was provided.

***Eleven days later***, on April 4th, while Diana was out having her chemotherapy port installed, at approximately 4:30 p.m., Schnack and Maddie McCauley, Human Resources Business Partner, left a voicemail for Diana to merely return the call. The next morning, on April 5th, at approximately 8:30 a.m., Schnack and McCauley called Diana and terminated her for an alleged violation of a non-existent policy. Diana had used her personal business to assist DLR in collecting outstanding funds that had remained unpaid for months due to DLR's inability to accept credit card payments.

Diana has sued DLR for disability discrimination and retaliation under federal and state law and for FMLA retaliation. Defendants now seek to dismiss all of Plaintiff's claims. Because genuine issues of material fact exist as to each claim, supported by evidence that DLR does not cite or address, DLR's motion for summary judgment should be denied. Support for this opposition is found in Plaintiff's Memorandum in Opposition to Summary Judgment, below.

Respectfully submitted,

*/s/ Kami D. Brauer*

KAMI D. BRAUER (#0071030)
STUART G. TORCH (#0079667)
EMPLOYMENT LAW PARTNERS, LLC
4700 Rockside Road, Suite 530
Independence, Ohio 44131
(216) 382-2500 (Phone); (216) 381-0250 (Fax)
Email:  kami@employmentlawpartners.com
            stuart@employmentlawpartners.com

*Counsel for Plaintiff Diana Gondeau-Guttu*

iii

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... v

ISSUES TO BE DECIDED ................................................................................................... vii

MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT .......................................... 1

    I.    STATEMENT OF FACTS ....................................................................................... 1

        A.    For close to 5 years, Diana successfully worked as a Financial Administrator
for DLR. ............................................................................................................... 1

        B.    Diana was diagnosed with breast cancer on January 9, 2023, and  immediately told
her Manager Aisha Khan of her diagnosis on January 16th. Contrary to Khan's deposition
testimony, Khan then advised Schnack that Diana was seriously ill and taking medical
leave under the FMLA. ............................................................................................ 2

        C.    Within days of learning of her illness and need for FMLA leave, Schnack and DLR
sought to have Diana terminated. .............................................................................. 3

            1.    Schnack and Khan falsely alleged that a new employee had filed a "formal
complaint" against Diana, which Schnack claimed was grounds for termination.......... 3

            2.    DLR initiated an investigation against Diana based on a suspiciously timed and
unsolicited passing comment from an unidentified employee. On that same day, Diana
inquired about FMLA leave. ...................................................................................... 3

            3.    Twelve days after requesting a work-from-home accommodation due to her
treatment, Diana was fired for collecting monies owed to DLR, allegedly violating a
DLR policy that did not actually exist. ...................................................................... 5

    II.    LAW AND ARGUMENT ........................................................................................ 10

        A.    DLR discriminated against Diana when it terminated her because of her disability
or because the decisionmaker regarded her as being disabled. ........................................ 10

        B.    DLR retaliated against Diana for taking leave and working from home to
accommodate her disability. .......................................................................................... 13

        C.    DLR's alleged justification for Diana's termination is mere pretext...................... 17

        D.    DLR had no honest belief in its reason for termination, given its lack of a proper
investigation, DLR paid Diana for collecting its money, and its failure to vet the
termination decision with HR. ....................................................................................... 19

    III.    CONCLUSION ...................................................................................................... 20

CERTIFICATE OF COMPLIANCE........................................................................................ viii

CERTIFICATE OF SERVICE ................................................................................................ viii

## TABLE OF AUTHORITIES

**CASES**

*A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687 (6th Cir. 2013) .......................... 14

*Amos v. McNairy County*, 622 Fed.Appx. 529 (6th Cir. 2015) ........................................... 15, 17

*Anderson v. Accuscripts Pharmacy, LLC*, 2022-Ohio-1663 (8th Dist.) .................................... 10

*Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019) .................................. 19

*Bryson v. Regis Corp.*, 498 F. 3d 561 (6th Cir. 2007) ...................................................... 14, 16

*Cady v. Remington Arms Company*, 665 Fed.Appx. 413 (6th Cir. 2016) ...................... 10, 11, 13

*Ceglia v. Youngstown State University*, 2015-Ohio-2125 (10th App. Dist.) ............................. 17

*Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579 (6th Cir. 2002) .................................. 18

*Clark v. Walgreen Co.*, 424 Fed.Appx. 467 (6th Cir. 2011) ................................................... 16

*Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000) ....................................... 16

*Craddock v. FedEx Corp. Services, Inc.*, No. 20-5655, 2021 WL 4127078 (6th
    Cir. Aug. 23, 2021) ....................................................................................................... 19

*Crispell v. FCA US, LLC*, 2024 WL 3045224 (6th Cir., June 18, 2024) .................................. 17

*Daugherty v. Sajar Plastics, Inc.*, 544 F. 3d 696 (6th Cir. 2008) ........................................... 14

*Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419 (6th Cir. 2014) ..................... 10

*EEOC v. Bd. of Regents of Univ. of Wisconsin System*, 288 F. 3d 296 (7th Cir.
    2002) .......................................................................................................................... 20

*Equal Empl. Opportunity Comm'n v. HP Pelzer Automotive Sys., Inc.*, 836 Fed.
    Appx. 422 (6th Cir. 2020) ............................................................................................ 19

*Ferrari v. Ford Motor Co.*, 826 F.3d 885 (6th Cir. 2016) ..................................................... 10

*Fisher v. Airgas USA, LLC*, 2024 WL 366246 (6th Cir., Jan. 31, 2024) .................................. 19

*Greer-Burger v. Temesi*, 116 Ohio St.3d 324 (2007) ........................................................... 14

*Hamilton v. General Electric Co.*, 556 F.3d 428 (6th Cir. 2009) ........................................... 18

*Horton v. Grede LLC*, 2024 WL 5357271 (E.D. Mich., Sept. 4, 2024) ................................... 17

*Johnson v. Cleveland City School Dist.*, 2011 WL 2409901 (8th Dist.) .................................. 14

*King v. Steward Trumbull Memorial Hosp., Inc.,* 30 F.4th 551 (6th Cir. 2022) ........................ 11

*Lee v. L3Harris Techs., Inc.*, No. 22-15288, 2023 WL 5318319 (9th Cir. Aug. 18,
    2023) .......................................................................................................................... 18

*LeMarbe v. Village of Milford*, 2021 WL 4972946 (E.D. Mich., Oct. 26, 2021) ................. 12, 15

*Lewis v. University of Pennsylvania*, 2019 U.S. App. LEXIS 23818 (3d Cir. 2019) ................ 12

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078 (6th Cir 1994) ................................ 17

*Marshall v. The Rawlings Company LLC,* 854 F.3d 368 (6th Cir. 2017) .................................. 14

*Matias v. Terrapin H., Inc.*, 2021 WL 4206759 (E.D. Pa., Sept. 16, 2021) ............................. 18

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) ........................................... 16

*Moore v. Next Generation Hosp., LLC*, 2005 WL 3025607 (6th Cir., Oct. 29, 2025) ........................................................................................................... 13

*Morrissey v. Laurel Healthcare Co.*, 946 F.3d 292 (6th Cir. 2019) ........................................... 12

*Singfield v. Akron Metropolitan Housing Authority, et al.*, 389 F.3d 555 (6th Cir. 2004) ........................................................................................................... 15

*Strickland v. City of Detroit*, 995 F.3d 495 (6th Cir. 2021) ........................................................ 17

*Swegan v. Shepherd of the Valley Lutheran Retirement Services, Inc.*, 2013 WL 1284309 (N.D. Ohio, March 25, 2013) ........................................................... 14, 18

*Thurman* v. *Yellow Freight Systems, Inc.*, 90 F.3d 1160 (6th Cir. 1996) ................................... 17

*Watkins v. Shriners Hospitals for Children, Inc.*, 2020 WL 2309468 (E.D. Ky., May 8, 2020) ........................................................................................................... 11

*Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634 (6th Cir. 2015) ............. 16, 19

## STATUTES

42 U.S.C. §12102(2) ........................................................................................................... 11

R.C. 4112.02(A) ........................................................................................................... 10

## REGULATIONS

29 C.F.R. §1630.2(j)(1)(v) ........................................................................................................... 11

**ISSUES TO BE DECIDED**

1) Could a reasonable jury determine that DLR knew or had reason to know that Diana suffered from a physical disability, breast cancer, when multiple members of management knew of Diana's cancer diagnosis and the ultimate decisionmaker regarding termination knew that Diana had a medical condition which prevented her from working for certain periods, prevented her from working at the office, and required leave under the FMLA?

2) Did DLR "replace" Diana after her termination on April 5, 2023, when it advertised and then hired another individual to perform her same duties later in that same year?

3) Could a reasonable jury determine that the decisionmaker knew that Diana engaged in protected activity by requesting leave under the FMLA and a temporary, full-time work from home accommodation when the decisionmaker knew that Diana had been working with her direct supervisor regarding her FMLA-covered leave and had requested from upper management that she be permitted to work from home?

4) Is there a causal link between Diana's protected activity and her termination when Diana was terminated approximately 2 months after the decisionmaker knew that Diana would be out on protected FMLA leave and within days of when the decisionmaker knew that she had requested a temporary, full-time work from home arrangement?

5) Is DLR's purported reason for termination, *i.e.,* violation of an unwritten policy, pretextual when: (a) the timing of Diana's termination is suspicious; (b) Schnack falsely alleged that another employee had filed a formal complaint against Diana that Schnack claimed constituted grounds for termination; (c) DLR's initiation of an investigation into Diana's prior criminal background was, at minimum, highly suspect and lead to the decision by Schnack and DLR to closely scrutinize Diana; (d) DLR's reason for termination has shifted; (e) Diana's use of

protected leave was discussed during the termination decision process; and (f) there is contradictory testimony as to the identity of the ultimate decisionmaker and whether Diana was replaced?

6) Did DLR have an "honest belief" in its reason for termination given its lack of a thorough investigation and failure to vet the termination decision through HR?

## SUMMARY OF PLAINTIFF'S ARGUMENT PRESENTED

Diana has presented sufficient evidence to create questions of fact for the jury as to whether she established her *prima facie* case of disability discrimination. DLR knew or had reason to know that Diana suffered from breast cancer, a physical disability. Members of upper management, including Diana's direct supervisor, Khan, knew of Diana's cancer diagnosis. Schnack, the ultimate decisionmaker regarding termination, knew that Diana had a medical condition which prevented her from working at times, prevented her from working at the office, and required Diana to utilize leave under the FMLA. Diana was terminated owing to her disability and was replaced by another individual to perform her same duties later that same year.

Diana has also presented sufficient evidence to create questions of fact for the jury as to whether she established her *prima facie* case of retaliation under federal and state disability law and the FMLA. Schnack admitted that she was aware that Diana engaged in protected activity by requesting protected medical leave under the FMLA and requesting a work-from-home arrangement from upper management. There is a causal link between Diana's protected activity and her termination as she was terminated approximately 2 months after Schnack knew that Diana would be out on protected FMLA leave and within days of Schnack learning that Diana had requested a temporary, full-time work from home arrangement.

Several indicia of pretext exist, thus creating a question of fact as to whether DLR's purported reason for termination, *i.e.,* violation of non-existent policy, was the true reason for Diana's termination. For example: (a) the close timing of Diana's termination to when Schnack learned of her disability and need for accommodation and use of FMLA is suspicious; (b) Schnack falsely alleged that another employee had filed a formal complaint against Diana which Schnack claimed constituted grounds for termination; (c) the initiation of DLR's investigation into Diana's

prior criminal background was suspect given that no one at DLR could identify who reported the second-hand information to HR, which lead to the decision by Schnack and DLR to closely scrutinize Diana; (d) DLR's reason for termination has shifted from a policy violation to now being predicated on Diana's alleged "rude" behavior and 15-year-old criminal background; (e) Diana's use of protected leave was discussed by Schnack during the termination decision process; and (f) there is contradictory evidence as to who was the ultimate decisionmaker and whether Diana was in fact replaced.

Based on its failure to complete an adequate investigation, DLR did not have an "honest belief" in its reason for termination, *i.e.,* a violation of a non-existent policy. Even though Schnack and others involved knew that Diana was out of the office for a medical procedure, Schnack did not wait to make the decision to terminate before Diana was provided an opportunity to explain why she utilized her personal business to collect outstanding funds owed to DLR. Further, no one reviewed any of the relevant documents or spoke to the other individuals with knowledge regarding the monies owed to DLR and why they had not been paid. Lastly, no one from HR vetted the decision to terminate Diana to determine if her termination was discriminatory or retaliatory.

x

## MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT

I.  **STATEMENT OF FACTS**

**A.  For close to 5 years, Diana successfully worked as a Financial Administrator for DLR.**

Diana began working for DLR as a Financial Administrator ("FA") in DLR's Cleveland office on June 11, 2018. In 2023, Diana's direct supervisor was Khan, then Regional Operation Controller, who also supervised three other FAs, Anita Walker (in the Cleveland office) and Gretchen Sparrow and Karen Andrews (in the Washington D.C. office). Khan's direct supervisor was Schnack, CFO. [Ex. 1, Int. #5 (Doc #25-1; Schnack Tr. 60:7-61:6 (Doc #24-2); Khan Tr. 14:10-16:6, 22:22-24:16 (Doc #24-1)].

Diana's duties as FA included distributing invoices to DLR customers, collecting payments, processing vendor invoices, approving payment of certain vendor, or trade, invoices, entering customer and vendor information into DLR's database, and entering project information from project contracts into DLR's database. [Khan Tr. 41:5-42:18; Guttu Tr. 34:11-35:25 (Doc #21-1)].

Throughout her tenure, Diana received positive performance feedback with no performance write-ups or disciplinary issues. [Guttu Tr. 59:20-60:19, 78:9-17; Khan Tr. 36:2-5]. She received regular annual pay increases in addition to discretionary bonuses. [Guttu Tr. 41:2-42:11]. In her August 2022 performance review, Khan noted that Diana "works hard on collecting unpaid invoices," and is "trustworthy and honest and hard working." [Khan Tr. 85:2-17; Ex. 8, 8/2022 Guttu Perf. Review (Doc #25-8 )]. Khan recommended Diana for promotion "every year", and Diana received "good recommendations and reviews from the project managers whom [she] worked closely with on a bi-weekly, weekly basis." [Khan Tr. 81:21-25; Guttu Tr. 190:25-191:4; Guttu Dec. ¶10 (Doc #26-1)].

1

**B. Diana was diagnosed with breast cancer on January 9, 2023, and immediately told her Manager Aisha Khan of her diagnosis on January 16th. Contrary to Khan's deposition testimony, Khan then advised Schnack that Diana was seriously ill and taking medical leave under the FMLA.**

On January 9, 2023, Diana was diagnosed with breast cancer. [Guttu Tr. 142:11-12]. On January 16th, Diana told Khan about her diagnosis and upcoming treatment to include surgeries and radiation. [Ex. 9, 1/16/23 Teams message (Doc #25-9); Khan Tr. 91:11-22]. Diana also told her colleagues about her diagnosis, including Walker, Sparrow, Andrews, and Diane Hansen, an Accounts Receivable Specialist in the Nebraska office with Schnack. [Khan Tr. 23:12-18; Guttu Tr. 142:25-143:6]. Diana did not tell Khan to refrain from telling anyone about her diagnosis and upcoming treatment. [Guttu Dec. ¶3]. At the time, Khan was also aware that Diana would be utilizing FMLA leave. [Khan Tr. 93:21-95:18]. Sometime between January 16th and early February, Khan, contrary to her own testimony, told Schnack (DLR's Rule 30(b)(6) designee regarding the reasons for Diana's termination)[2] that Diana was ill and would be taking protected medical leave, which Schnack knew was covered under the FMLA. [Schnack Tr. 43:11-44:3, 46:5-11, 51:21-52:4; *compare to* Khan Tr. 98:5-99:5].

Diana participated in DLR's self-funded health insurance plan during her employment at DLR. [Johnson Tr. 45:19-22 (Doc #24-3)]. As DLR's Rule 30(b)(6) witness on the subject, Johnson testified that DLR obtained a stop-loss policy, which would protect it against high cost claims from a single covered employee. [Ex. 27, Rule 30(b) Notice (Doc #25-26)[3]; Johnson Tr. 10:15-11:25, 52:11-18, 53:19-54:19;]. For the policy to be triggered, DLR had to pay a deductible of $200,000 for each covered employee. [Johnson Tr. 54:20-23]. Diana, after her treatments began, was considered a "high cost claimant." [Johnson Tr. 65:6-66:15].

---

[2] See Ex. 27 (Doc #25-26), Plaintiff's Amended Rule 30(b)(6) Notice of Deposition, for those subjects on which Schnack was designated as DLR's corporate representative to testify. [Schnack Tr. 9:2-25].
[3] Prior to her deposition, Johnson was also designated as DLR's witness for Items K and M.

**C. Within days of learning of her illness and need for FMLA leave, Schnack and DLR sought to have Diana terminated.**

### 1. Schnack and Khan falsely alleged that a new employee had filed a "formal complaint" against Diana, which Schnack claimed was grounds for termination.

On February 2nd, Khan and Schnack had a call with Diana to tell her that a new employee, Kimberly Chin (a/k/a Kimberly Dai), who had just started at DLR in their New York office on January 23rd, had filed a formal complaint against Diana about a recent interaction with her. [Ex. 6, 1/2023 K. Chin (Doc #25-6); Khan Tr. 70:15-73:23; Schnack Tr. 16:23-18:11; Guttu Tr. 73:18-74:20]. Schnack, who was under the false impression that the interaction between Diana and Chin was verbal, bizarrely told Diana that this formal complaint, from a new employee at the job for approximately 10 days, was grounds for termination. [Guttu Tr. 84:10-85:20]. Schnack had not even talked with Chin about her alleged complaint. [Schnack Tr. 20:11-13]. When Diana corrected Schnack that no verbal conversation had occurred and offered to forward the email exchange between her and Chin, Schnack suddenly went silent. The call quickly ended, and Diana forwarded the email exchange to Schnack. [Guttu Tr. 74:21-75:23, 86:6-88:12; Guttu Dec. ¶4; *compare to* Khan Tr. 75:19-23 and Schnack Tr. 19:15-20:2]. No formal complaint, however, was ever filed by Chin. [McCauley Tr. 45:8-47:8 (Doc #24-5)]. In fact, Chin had complained about multiple other DLR employees, and DLR was "not sure" what Chin was complaining about as it related to Diana. [McCauley Tr. 42:19-44:21; Ex. 18, T. Gallagher Email (Doc #25-17)]. No disciplinary documentation was placed in Diana's file. [Guttu Tr. 84:21-85:5; Khan Tr. 76:9-12].

### 2. DLR initiated an investigation against Diana based on a suspiciously timed and unsolicited passing comment from an unidentified employee. On that same day, Diana inquired about FMLA leave.

On or about February 9th, an unidentified DLR employee, for no apparent reason, made an unsolicited, passing comment to Johnson, Chief HR Officer, that "our financial advisor in

3

Cleveland" had a criminal background. [Johnson Tr. 83:25-87:1]. Johnson allegedly asked the unidentified person how they learned of this information but the response was "vague, in that someone discovered it." Johnson, however, did not ask the unidentified employee who this other "someone" was. [Johnson Tr. 87:2-7, 102:6-19]. Although there were 2 FAs in Cleveland, Diana and Walker, Johnson seemed to have focused her research only on Diana. The next day, on February 10th, Johnson advised in-house counsel that Diana had a criminal matter approximately 15 years prior. [Johnson Tr. 83:3-21, 89:10-90:16; Ex. 36, 2/10/2023 Emails (Doc #25-34)]. That same day, Diana emailed HR she needed to undergo several surgeries with intermittent absences and inquired about FMLA leave. [Ex. U, 2/10/23 Email (Doc #21-7); Guttu Tr. 155:2-11].

In response, Mark Dunbar, DLR General Counsel and Rule 30(b)(6) designee[4] regarding this investigation, immediately inquired of Johnson as to whether Diana had "[made] a misrepresentation of fact regarding prior convictions on any job application". [Dunbar Tr. 19:16-20:5 (Doc #24-4); Ex. 36, 2/10/2023 Emails]. Counsel did not bother asking Johnson how she even learned of this information. [Dunbar Tr. 22:3-17]. Johnson confirmed to Dunbar that Diana had not made any misrepresentation. [Johnson Tr. 92:6-19; Dunbar Tr. 24:2-14]. Ultimately, DLR decided that nothing could be done regarding Diana's background because it did not perform background checks or collect information regarding criminal history prior to hiring employees and because Diana had no history of theft with the company. [Johnson Tr. 94:7-95:11]. Johnson claims that she and Dunbar made that decision, while Dunbar claims Schnack and possibly Johnson made the decision. [Johnson Tr. 94:13-95:7; Dunbar Tr. 26:11-19]. Schnack claims it was a group decision. [Schnack Tr. 22:9-23:23].  In any case, DLR admitted Diana would be closely scrutinized. [*See* DLR motion, pg. 5; *see also* Johnson Tr. 96:11-19].

---

[4] See Ex. 27, Plaintiff's Amended Rule 30(b)(6) Notice of Deposition, for those subjects on which Dunbar was designated as DLR's corporate representative to testify. [Dunbar Tr. 8:11-25].

Tellingly, since its investigation into Diana's background, DLR continues not to perform background checks and has not made changes to its recruiting process. [Johnson Tr. 94:20-95:3]. Thus, DLR apparently had no ongoing concern about hiring others with a criminal background.

### 3. *Twelve days after requesting a work-from-home accommodation due to her treatment, Diana was fired for collecting monies owed to DLR, allegedly violating a DLR policy that did not actually exist.*

On February 16th, Diana applied for FMLA leave with an anticipated return-to-work date of March 8, 2023, and was subsequently approved. [Guttu Dec. ¶5; Johnson Tr. 28:5-11]. Diana underwent her first surgery on February 22nd with follow-up chemotherapy and radiation. [Guttu Tr. 142:13-20].  In early March, Diana shared with Khan and her co-workers that she would need to undergo continuous chemotherapy and radiation therapy and have additional surgeries. [Guttu Dec. ¶6]. Although Diana was unable to return to the office on March 8th due to her diagnosis and continuing treatment, she performed her job duties while working from home. On March 24th, Diana advised Matthew Janiak, DLR's Northeast Region Leader, and Philip LiBassi, DLR's Global Healthcare Sector Leader, that her absence from the office was due to her breast cancer treatment and requested a temporary work-from-home accommodation. [Ex. 10, 3/24/23 Email (Doc #25-10); Guttu Tr. 143:13-18; Guttu Dec. ¶7]. Janiak never responded to her email, and neither addressed her remote work request. [Guttu Tr. 146:13-147:4, 154:13-22].

On April 4th, Diana was to have her chemotherapy port installed and had advised Khan and her colleagues she would be out of the office. [Ex. 14, Text Messages (Doc #25-14); Khan Tr. 122:10-123:12; Guttu Dec. ¶8. On that same day, at around 4:30 p.m., Schnack and McCauley called Diana and left a voicemail to call back, despite knowing Diana was out of the office all day for a doctor's appointment. [Schnack Tr. 30:22-31:20; Guttu Dec. ¶8]. The next morning, on April 5th, at approximately 8:30 a.m., Schnack and McCauley called Diana on the

telephone and terminated her for an alleged policy violation, discussed more fully below in Subsection 3.a. [Schnack Tr. 39:21-25]. During the termination meeting, Schnack confirmed to Diana that DLR had no policy prohibiting the alleged misconduct that formed the basis for terminating her. [Schnack Tr. 40:20-41:7; Guttu Tr. 189:11-190:10]. When Diana asked if her termination had anything to do with her terminal medical condition, oddly and without hesitation, Schnack's immediate response was, "I did not know you had a terminal medical condition." [Schnack Tr. 42:13-43:14]. Schnack appeared unphased and not surprised by Diana's news, nor did she offer any words of empathy. [Guttu Dec. ¶9].

### a.  *Diana collected monies owed to DLR that were months overdue.*

The alleged policy violation involved the credit card payments made by a DLR client, the Department of Veteran Affairs (the "VA"), for a feasibility study (Project-00, totaling $2,100) and for related consultant fees (Project-01, totaling $2,200). For Project-00, Diana alerted Khan and the Project Manager Shawn Carr, along with others, that the VA insisted on paying by credit card, even though she advised the VA that DLR did not accept credit cards. [Ex. 12, 11/9/2021 Email (Doc #25-12); Khan Tr. 110:13-113:23; Guttu Dec. ¶¶11-12]. Having received no response, Diana emailed the VA advising DLR did not accept credit cards. [Ex. 50, 11/18/21 Email (Doc #26-3); Guttu Dec. ¶13].

Diana attempted for months to have the VA pay using a different payment method, but to no avail. [Ex. 51, Emails re Payment (Doc #26-4); Guttu Dec. ¶14]. For Project-01, because the VA was having difficulty paying the related consultant fees directly, it asked DLR to pay the consultant *and authorized DLR to include an additional fee for processing the payment.* [Schnack Tr. 56:8-12; Ex. 52, 5/3/22 Email (Doc #26-5); Guttu Dec. ¶16]. Later, during a Teams call on June 10, 2022, with the VA, Diana explained that she could utilize a third-party vendor to

6

process credit card payments by the VA to pay the consultant fees, along with the outstanding invoice for Project-00, which she also told Carr. [Guttu Tr. 118:20-119:15; Guttu Dec. ¶15]. Thus, at the VA's request, Diana prepared a draft proposal and emailed it to Carr reiterating the issue and requesting that he execute it, which he did. [Ex. 52; 5/3/22 Email; Ex. 53, 7/22/22 Email to Carr (Doc #26-6); Guttu Dec. ¶¶16-18]. The proposal showed that, of the $2,200, DLR was to receive $500 in administrative fees. Diana emailed this information to Hansen, the Accounts Receivable Specialist in Schnack's office. [Ex. 13, 7/25/22 Email (Doc #25-13); Khan Tr. 119:9-121:18; Guttu Dec. ¶¶19-20].

The third-party vendor that eventually processed the credit card payments is Property Solutions of Ohio, Inc. ("PSO"), a company that Diana and her husband had owned *for the past 21 years*. As admitted by DLR, Diana entered PSO into DLR's vendor database in July 2022, listing her home address as PSO's address. [Dunbar Tr. 54:6-10; Ex. 16, 4/4 Emails re PSO (Doc #25-16)]. Regarding the monies collected, Diana wrote to DLR a check for $2,200 on March 31, 2023, days prior to her termination, which she deposited that day into DLR's account. Diana then wrote another check to DLR for $2,100 after her termination. [Exs. 44 & 46, Checks (Doc ##25-40 & 25-42; Schnack Tr. 35:21-36:14, 55:15-23]. Diana submitted an invoice to DLR for the processing fees PSO incurred, which she approved on April 3rd. On the invoice, Diana again listed for PSO her home address and personal cell number. [Ex. P (Doc #21-5); Guttu Dec. ¶21].

> **b. DLR conducted a biased and rushed investigation into Diana's alleged "policy" violation in collecting the overdue funds, failing to talk to Diana and review pertinent documents.**

On April 4th, while Diana was out of the office getting her chemo port installed, Accounts Payable Specialist Rhonda Kuehlthau emailed Diana and FA Walker questioning the PSO invoice approved the day before by Diana. Walker responded, copying Khan, but not until 6:37

p.m. that night. Somehow, Khan was alerted to the issue earlier in the day and roped in Schnack, who then roped in Dunbar. [Ex. 15, 4/2023 Khan Email to Carr (Doc #25-15); Ex. 16, 4/2023 Emails re PSO (Doc #25-16); Khan Tr. 124:1-125:7, 127:4-128:18; Schnack Tr. 28:2-29:15; Dunbar Tr. 28:13-29:6].

The following information was gleaned from DLR's "investigation": (1) Diana was out of the office on April 4th for a medical procedure and was not expected to respond to emails [Khan Tr. 130:9-17; Schnack Tr. 31:14-20]; (2) Carr did not approve Diana's invoice, which was already known since the invoice was marked "approved by Diana Gondeau-Guttu"; (3) PSO's address was Diana's home address, which DLR knew and was listed in DLR's database and on the PSO invoice; (4) PSO's email address was Diana's personal email address, which DLR knew; (5) Diana's sister was listed as PSO's contact, which DLR apparently knew the person listed was Diana's sister; (6) PSO was formed in 2001, 21 years prior; (7) the original address listed in 2001 for the company was a property formerly owned by Diana that was sold in 2003; (8) Diana deposited DLR's money into its account, per her usual job duties; (9) Janiak confirmed that "sometimes the VA wants to pay by credit card"; (10) the fee charged by Diana "was probably the fee charged by the credit card processing company;" and (11) DLR planned to reimburse Diana for any fee "as she did likely incur it in an effort to get us paid." [Exs. 15, 16, 20 (Doc #25-19), 21 (Doc #25-20), & 22 (Doc #25-21); Johnson Tr. 103:19-104:11, 114:21-116:15].

No one reviewed any underlying documents regarding the monies owed to DLR, nor did anyone have a conversation with Carr, the Project Manager, or anyone from the VA. [Schnack Tr. 31:3-9, 52:22-53:8; Dunbar Tr. 34:18-36:5; Khan Tr. 115:18-116:24, 125:22-126:8; Johnson Tr. 113:14-114:13]. Most importantly, no one talked to Diana or waited until she responded to Khan's earlier email. [Schnack Tr. 30:22-31:2; Khan Tr. 131:21-132:18].

> ### c. Schnack, knowing of Diana's illness and FMLA leave, made the decision to terminate Diana before getting her side of the story and in spite of the information learned during DLR's limited investigation.

Despite the information learned during DLR's investigation, according to Schnack, "[p]ersonally [Diana] doing this without alerting anyone was still grounds for termination in my opinion." [Ex. 22, 4/4 Email (DLR 1998); Schnack Tr. 34:14-35:1]. Schnack claimed she did not make the decision to terminate until after talking with Diana the next day on April 5th. [Schnack Tr. 39:8-20]. However, McCauley testified that the termination decision was made on April 4th, which is corroborated by an internal email sent at 8:04 a.m. on April 5th, prior to the termination call, providing that Diana was involuntarily terminated. [McCauley Tr. 76:19-78:3; Ex. 23, DGG Offboarding (Doc #25-22)]. Schnack admitted that, prior to Diana's termination call, she knew that Diana was "sick" and had been on protected medical leave under the FMLA. [Schnack Tr. 43:11-44:3]. During the discussion around termination, either Johnson or McCauley mentioned to Schnack that Diana "had been on medical leave in the prior couple of months." [Schnack Tr. 45:6-17]. Schnack also confirmed to Diana that no policy existed addressing this alleged misconduct to justify Diana's termination. [Schnack Tr. 40:20-41:7].

> ### d. DLR paid Diana for the fees incurred by her for collecting DLR's money.

The fees incurred to complete the transactions totaled $196.71. PSO charged the usual and customary fee of 3% (i.e., $130.00) for processing the payments. Thus, the total amount of monies retained by PSO, which was not a reimbursement for fees incurred, equaled $130.00. After her termination, Diana provided proof of her fees to Schnack. [Ex. 43, Emails re PSO fees (Doc #25-39); Schnack Tr. 53:13-54:6; Guttu Dec. ¶21]. Schnack approved the payment to PSO of $330.00, representing all funds requested by Diana to reimburse PSO. The remainder of the funds, $170.00, was retained by DLR. [Id.; Ex. 45, DLR Check to PSO (Doc #25-41); Schnack Tr. 56:13-57:15].

9

On August 29, 2023, Diana timely filed a charge of disability discrimination and retaliation against all Defendants with the EEOC, which was dual filed with the Ohio Civil Rights Commission, and received her EEOC Right to Sue notice dated November 7, 2023. [Ex. A, Second Amended Complaint (Doc #19); Ex. 56, Dual Filed Notice (Doc #26-9); Guttu Dec. ¶22]. On January 29, 2024, Diana brought suit against the DLR Defendants for, *inter alia*, Disability Discrimination and Retaliation under the ADAAA and R.C. 4112.02(A) and (I), and Retaliation under the Family and Medical Leave Act of 1993. (See Doc ##1 & 19).

## II. LAW AND ARGUMENT

### A. DLR discriminated against Diana when it terminated her because of her disability or because the decisionmaker regarded her as being disabled.

At summary judgment, for the *prima facie* case, Diana must show that: (1) she is disabled or regarded as having a disability; (2) she was qualified for her position with or without an accommodation; (3) she suffered an adverse employment action, at least in part, because of her disability; (4) DLR knew or had reason to know of her disability; and (5) her position remained open while DLR sought other applicants or Diana was replaced. *Cady v. Remington Arms Company*, 665 Fed.Appx. 413, 419 (6th Cir. 2016); *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014). Under R.C. 4112.02(A), the *prima facie* case differs: (1) she is disabled or regarded as being disabled; (2) an adverse action was taken by the employer, at least in part, because she was disabled; and (3) she, although disabled, can safely and substantially perform the essential functions of her job. *Anderson v. Accuscripts Pharmacy, LLC*, 2022-Ohio-1663, ¶44 (8th Dist.); *compare to Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016).

For purposes of summary judgment, DLR does not dispute that Diana was disabled. Diana suffered from breast cancer for which Diana endured multiple surgeries, chemotherapy, and radiation, which affected her ability to eat, sleep, and work. To recover from her treatment, she

required time off of work and to work from home. [Guttu Dec. ¶2; Ex. 38, FMLA Cert. (Doc #25-36); Johnson Tr. 32:21-33:25]. *See Watkins v. Shriners Hospitals for Children, Inc.*, 2020 WL 2309468, *5 (E.D. Ky., May 8, 2020); 42 U.S.C. §12102(2) and 29 C.F.R. §1630.2(j)(1)(v) ("The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis."). Johnson, DLR's Rule 30(b)(6) witness, admitted that cancer is a disability. [Johnson Tr. 36:21-23]. DLR also does not dispute that Diana was qualified for her position. As detailed above in Section I.A., Diana, until her termination, received positive feedback regarding her performance and had not received any performance or disciplinary write-ups. DLR also cannot dispute that Diana suffered an adverse employment action, *i.e.,* termination.

DLR does dispute, however, that DLR's decisionmakers knew of Diana's disability. DLR claims that it is "undisputed" that Schnack, Johnson, and Dunbar were the decisionmakers. However, Johnson did not learn of the termination decision until 24 hours after Diana's termination. [Johnson Tr. 118:7-15]. Dunbar testified that it was Schnack who made the decision to terminate. [Dunbar Tr. 42:9-12]. Khan understood that Schnack was the decisionmaker. [Khan Tr. 131:3-5]. In any case, Diana has presented sufficient evidence to create a question for the jury as to whether DLR's decisionmaker either knew, or had reason to know, of Diana's disability or regarded her as being disabled. For an employer to be on notice that an employee is disabled, the word "disabled" does not have to be used. *Cady*, 665 Fed.Appx. at 417. Instead, the employee need provide only enough information to the employer about her condition for the employer to conclude that she is disabled. *Id.; see also King v. Steward Trumbull Memorial Hosp., Inc.,* 30 F.4th 551, 563-564 (6th Cir. 2022). To be "regarded as" having a disability, "the question whether an employer perceived a limitation as impacting an employee's ability to work is an inquiry into

11

the supervisory state of mind that rarely is amenable to disposition on a cold record." *LeMarbe v. Village of Milford*, 2021 WL 4972946, *11 (E.D. Mich., Oct. 26, 2021).

Here, Schnack admitted that she knew Diana was sick enough to use protected FMLA leave, ***which was mentioned, by either Johnson or McCauley, during Schnack's discussion with both regarding whether Diana should be terminated on April 4th.*** [Schnack Tr. 45:6-17]. Khan, who knew of Diana's cancer, told Schnack that Diana would be out on medical-related leave, not able to work, and eventually working from home because of her illness. Khan and Schnack discussed whether Diana's workload would be covered. [Schnack Tr. 62:19-25]. Khan also advised Schnack that Diana had revealed to Janiak and LiBassi that she was unable to work in the office. [Schnack Tr. 63:1-15]. Schnack knew that Diana was out of the office April 4th because of a doctor's appointment. [Schnack Tr. 31:14-20]. Such information – that Diana had a medical condition affecting her ability to work – is enough to create a question for the jury as to whether Schnack regarded Diana has having a disability or whether Schnack was on notice that Diana had a disability to be accommodated. *Compare Morrissey v. Laurel Healthcare Co*., 946 F.3d 292, 300 (6th Cir. 2019) (when an employee tells their employer they cannot work certain hours because of a medical condition, that is "enough" notice to trigger the accommodation process, even when the employee does not specify the diagnosis).

Schnack also talked with Janiak on April 4th, who knew of Diana's cancer. Johnson, DLR's Rule 30(b)(6) witness, admitted Janiak, in addition to LiBassi and Khan, knew of Diana's cancer diagnosis. [Johnson Tr. 37:21-38:7]. Moreover, Schnack's matter-of-fact reaction to learning that Diana had a "terminal illness" raises the question of whether she already had knowledge about her cancer. DLR walks a fine line as to Schnack's knowledge. Given this evidence, it is hard to fathom, and certainly a question for the jury, that Schnack, the ultimate decisionmaker, did not know or

12

have reason to know that Diana's medical condition was a disability or that Schnack regarded her as having a disability. DLR also disputes that Diana was replaced or that similarly situated employees were treated more favorably. Diana, however, can show that her position remained open until DLR found her replacement. *Cady, supra.* Initially, Khan testified that Diana was not replaced but that her job duties were absorbed by her other team members. [Khan Tr. 29:20-24]. Khan later testified, however, that the absorption of Diana's duties was because it "takes time to get a new person in place" and that, relatively soon after, DLR decided to advertise for an additional FA. [Khan Tr. 31:19-32:12]. As testified to by Diana, at the time of her termination: "[W]e were overwhelmed with work. We really could use a part-time person. I voiced that to Aisha Khan, my supervisor. And we did not receive any help. So we were under water." [Guttu Tr. 79:5-10]. Diana was in fact replaced in November 2023. At the time of Diana's termination, there were two FAs in the Cleveland office – her and Walker. Walker, at least as of July 17, 2024, over 1 year after Diana's termination, was still employed at the Cleveland office. Then, DLR hired Michelle Lagina as a "Project Accountant" for the Cleveland office on November 13, 2023. DLR had changed the title of "Financial Administrator" to "Project Accountant". [Schnack Tr. 61:7-15; Ex. 54, 5/23/25 Ltr. (Doc #26-7); Khan Tr. 31:4-8]. As of her deposition in March 2025, Khan still supervised two Project Accountants in the Cleveland office. [Khan Tr. 31:9-11].[5] Thus, questions as to DLR's knowledge of Diana's disability and her replacement are for only the jury to decide.

**B. DLR retaliated against Diana for taking leave and working from home to accommodate her disability.**

A request for accommodation is a protected act under the ADAAA and R.C. §4112. *Moore v. Next Generation Hosp., LLC*, 2005 WL 3025607, *8 (6th Cir., Oct. 29, 2025), *affirming A.C. ex*

---

[5] Lagina was terminated after being placed on a 30-day performance improvement plan in October 2024. Sue Bandy was then hired as a Project Accountant for the Cleveland office in December 2024. [Ex. 54, 5/23/25 Ltr; Ex. 55, Lagina PIP (Doc #26-8); K. Brauer Dec. ¶¶2-3; Khan Tr. 37:6-39:8; Schnack Tr. 61:19-62:8].

13

*rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687 (6th Cir. 2013); *Johnson v. Cleveland City School Dist.*, 2011 WL 2409901 (8th Dist.). The analysis for a claim of retaliation is the same under the ADAAA, R.C. §4112, and the FMLA. *See Greer-Burger v. Temesi*, 116 Ohio St.3d 324 (2007); *Marshall v. The Rawlings Company LLC,* 854 F.3d 368, 379 (6th Cir. 2017); and *A.C. ex rel. J.C.,* 711 F.3d at 697. Diana can demonstrate retaliation by showing that: (1) she engaged in protected activity; (2) DLR knew of her protected activity; (3) DLR took an adverse employment action against her; and (4) a causal link is shown between her protected activity and her termination. At the *prima facie* stage, Diana's burden of proof is minimal. *Swegan v. Shepherd of the Valley Lutheran Retirement Services, Inc*., 2013 WL 1284309, *7 (N.D. Ohio, March 25, 2013), *citing Bryson v. Regis Corp*., 498 F. 3d 561, 570 (6th Cir. 2007). Diana does not need to prove that retaliation was the sole reason for her termination but was only a substantial or motivating factor in the employer's decision. *Id*., *citing Daugherty v. Sajar Plastics, Inc*., 544 F. 3d 696, 707 (6th Cir. 2008).

DLR argues that it had no knowledge of Diana's disability or her protected activity and that Diana cannot show causation. Diana, however, has put forth sufficient evidence, detailed in Sections I.B. & II.A., to create a jury question whether DLR's decisionmaker, Schnack, knew of her disability. As to Diana's accommodation requests, while DLR on the one hand says it had no knowledge of Diana's disability or her protected activity, Johnson, DLR's Rule 30(b)(6) witness on the subject, testified that DLR actually offered Diana two accommodations, *i.e.,* work from home beyond DLR's hybrid work-from-home policy and flexible work hours. [Johnson Tr. 44:11-24]. *See LeMarbe*, 2021 WL 4972946 at *12 ("The offer to accommodate is in itself further evidence that the plaintiff was regarded as having a condition that warranted accommodation."). In any case, Diana herself requested two accommodations, *i.e.,* leave under the FMLA and

14

temporary, full-time work from home. Khan, Janiak, and LiBassi knew of Diana's cancer and work from home request. Schnack knew that Diana was on medical-related leave covered by the FMLA, and was unable to work, as of early February 2023. [Schnack Tr. 43:18-46:11, 51:21-52:4].

Regarding her FMLA leave, there is no dispute that Diana was eligible for FMLA leave and was approved for such leave. [Ex. 31, 2/2023 Emails re FMLA Approved (Doc #25-29); Johnson, Tr. 28:5-11, 35:1-20]. DLR, however, claims that two of the three decisionmakers did not know of Diana's FMLA leave and that Schnack did not know of the underlying reason for the FMLA leave. Again, Schnack, the admitted decisionmaker, knew that Diana was on FMLA leave. Whether she knew of the underlying reason, which she in fact did, or whether Johnson[6] or Dunbar knew of Diana's FMLA leave are of no consequence, or at minimum a question for the jury. *See LeMarbe*, 2021 WL 4972946 at *16 ("[K]nowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action.", *quoting Polk v. Yellow Freight Sys., Inc*., 876 F.2d 527, 553 (6th Cir. 1989).

Diana was terminated less than 2 months after she applied for FMLA leave and within days of her March 24th email to Janiak and LiBassi requesting temporary, full-time work from home, of which Khan advised Schnack of such email soon thereafter. [Ex. 10, 3/24/23 Email; Schnack Tr. 63:1-15, 64:3-12].  Such close temporal proximity can alone establish causation. *See LeMarbe, supra.*; *Amos v. McNairy County*, 622 Fed.Appx. 529, 537-538 (6th Cir. 2015) ("This court has explicitly held that temporal proximity alone can establish causation."); *Singfield v. Akron Metropolitan Housing Authority, et al.*, 389 F.3d 555, 563 (6th Cir. 2004) (termination over 3 months after plaintiff submitted discrimination complaint shows causation); *Bryson,* 498 F.3d at

---

[6] Johnson had access to and could review emails sent to hr@dlrgroup.com, to which Diana sent her FMLA request. [Ex. 30, 2/2023 FMLA Emails (Doc #25-28); Johnson Tr. 28:20-30:21].

571; *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 650 (6th Cir. 2015); *Clark v. Walgreen Co.*, 424 Fed.Appx. 467, 473 (6th Cir. 2011) (*per curiam*) (2 months between leave and firing shows causal connection).

While temporal proximity is sufficient to establish causation, Diana also set forth additional evidence of causation. As detailed above, DLR immediately began its campaign to get rid of Diana in early February upon learning of her cancer and upcoming FMLA leave. Until her termination, Diana had a good performance record with no prior discipline. DLR's truncated investigation into Diana's alleged violation of a non-existent policy also shows causation, especially since Schnack made the decision to terminate before allowing Diana to explain what happened.

Although DLR insinuated that Diana was attempting to perpetrate some sort of fraudulent scheme, such is belied by DLR's own admissions. Dunbar admitted it was clear Diana was not trying to perpetrate any sort of scheme, given that, "[t]here [are] many ways for her to hide association with a company, which makes her conduct here rather stupid, as far as a criminal/fraudulent scheme goes." [Ex. 20, 4/4/2023 Dunbar Email re PSO; Dunbar Tr. 28:1-12, 36:6-37:25]. During the termination meeting, McCauley confirmed DLR did not think Diana did anything maliciously or on purpose. [Schnack Tr. 42:4-9; Guttu Tr. 165:7-11]. Moreover, DLR paid Diana for collecting on the outstanding invoices.

Finally, DLR claims that Diana's alleged policy violation is an "intervening cause" dispelling any inference of causation. DLR is arguing nothing more than its alleged legitimate, non-retaliatory reason for termination which cannot be considered in the *prima facie* case. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (district court improperly conflated the distinct stages of the *McDonnell Douglas* inquiry by considering defendant's non-discriminatory reason to determine whether plaintiff established her *prima facie* case). In virtually

all retaliation cases, the employer claims some wrongful conduct by the employee after she engages in protective activity allegedly justifying the termination and thus hiding its retaliatory motive. In fact, in the case cited by DLR, *Horton v. Grede LLC*, 2024 WL 5357271 (E.D. Mich., Sept. 4, 2024), while the court cites this proposition of an intervening cause, it then merely follows the *McDonnell Douglas* burden shifting paradigm. In any case, Diana has put forth evidence, in addition to temporal proximity, to establish causation and thus create a question for the jury.

## C. DLR's alleged justification for Diana's termination is mere pretext.

To prove pretext, Diana must show that the stated reasons for termination: (1) have no basis in fact; (2) did not actually motivate the discharge; *OR* (3) were insufficient to explain the discharge. *See Crispell v. FCA US, LLC*, 2024 WL 3045224, *12 (6th Cir., June 18, 2024). As to the second prong, the court in *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir 1994) held: "There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. . . . In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Manzer, supra.* At summary judgment, plaintiff need only produce evidence to rebut the employer's reasons for the adverse employment action, not disprove them. *Ceglia v. Youngstown State University*, 2015-Ohio-2125, ¶27 (10th App. Dist.).

Here, Diana has a myriad of indicia of pretext. For example, while temporal proximity alone cannot be the sole basis for finding pretext, "suspicious timing, however, 'is a strong indicator of pretext when accompanied by some other, independent evidence.'" *Amos*, 622 Fed.Appx. at 539. DLR's shifting reasons for termination is also evidence of pretext. *See Thurman* v. *Yellow Freight Systems, Inc.*, 90 F.3d 1160 (6th Cir. 1996); and *Cicero v. Borg-Warner*

17

*Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). While DLR initially claimed that Diana was terminated for violating an alleged unwritten policy, it now claims that her termination was also predicated on Diana's alleged "rude" behavior and her prior criminal background. But DLR had known about Diana's strong personality for years, and such never stopped DLR from giving her good performance reviews, annual raises, and recommendations for promotion. [Khan Tr. 67:2-68:4]. *See* Section I.A. Further, she was never disciplined. *See Matias v. Terrapin H., Inc.*, 2021 WL 4206759, *4 (E.D. Pa., Sept. 16, 2021) (strong inference of discrimination when plaintiff had not received discipline up to point of termination).

As to her prior criminal background, DLR was unable to rely on that reason for termination at the time it discovered it because Diana never misrepresented her background to DLR and had not engaged in any wrongful conduct throughout her almost 5 years with the company. [Johnson Tr. 95:4-13]. Again, had DLR been so concerned about whether its employees had criminal backgrounds, it would have changed its policies and procedures, but it has not. *See* Section C.2. Using this investigation as an excuse, and after Diana had engaged in protected activity, DLR admitted that it subjected Diana to closer scrutiny. *Hamilton v. General Electric Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (pretext shown by temporal proximity plus closer scrutiny).

Schnack admitted that, during termination discussions, it was mentioned Diana was on protected medical leave. Discussing protected leave status during a termination discussion may be evidence of pretext. *See Lee v. L3Harris Techs., Inc.*, 2023 WL 5318319, *2 (9th Cir., Aug. 18, 2023). Finally, contradictory testimony regarding the ultimate decision maker and whether Diana was replaced are also evidence of pretext. *See* Section II.A.; *see also Swegan* 2013 WL 1284309 at *7 (factfinder may infer a furtive motive from [defendant's] contradictory testimony).

**D. DLR had no honest belief in its reason for termination, given its lack of a proper investigation, DLR paid Diana for collecting its money, and its failure to vet the termination decision with HR.**

To demonstrate an honest belief, the employer must provide evidence that it made a "reasonably informed and considered decision" based on reasonable reliance on "particularized facts that were before it" when it fired the employee. If an employer conducts no meaningful investigation, it cannot show the requisite "honest belief." *See Fisher v. Airgas USA, LLC*, 2024 WL 366246, *2 (6th Cir., Jan. 31, 2024). Here, the bulk of the investigation into Diana's actions were done via email, as Schnack and Dunbar only communicated via email. [Schnack Tr. 26:2-5]. Before the decision to terminate was made, no one spoke or otherwise communicated with Diana. No one reviewed any of the underlying documents regarding the outstanding monies owed or spoke to any of the other parties involved, including its own Project Manager. *See* Section I.C.3.b., above; *see also Equal Empl. Opportunity Comm'n v. HP Pelzer Automotive Sys., Inc.*, 836 Fed. Appx. 422, 429–30 (6th Cir. 2020) (for honest belief, investigation must be thorough). DLR's investigation was anything but thorough as it did not interview relevant individuals, or Diana. *See Craddock v. FedEx Corp. Services, Inc.*, 2021 WL 4127078, at *5 (6th Cir. Aug. 23, 2021), *citing Yazdian,* 793 F.3d at 654 (employer not entitled to summary judgment under "honest-belief" rule where plaintiff's co-workers were not interviewed about misconduct). Given that the FAs were "overwhelmed with work", terminating Diana, an experienced FA, did not make business sense. [Guttu Tr. 79:10-14]. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 323 (6th Cir. 2019) (question of fact whether a "reasonable anesthesiology practice would have *actually relied on those facts* to fire an experienced nurse practitioner like Babb." Emphasis in original). Further, DLR paid Diana her fees to collect its money, thus raising a jury question as to whether Diana's actions warranted termination.

19

Finally, no one from HR vetted the decision to terminate, and it was DLR's policy not to. [Johnson Tr. 26:2-27:3, 119:6-120:13]. If McCauley, an HR Director, is to be believed, she reviewed termination decisions by reviewing the subject employee's personnel file, determining if the employee fell within a protected class or was being accommodated or on protected leave, reviewing any relevant policies, and possibly talking with the subject employee. Anything she found would then be reported to the decisionmaker. [McCauley Tr. 24:7-27:4]. For Diana's termination, despite being involved in discussions regarding Diana's termination, she took none of those steps. [McCauley Tr. 73:5-75:3]. *See EEOC v. Bd. of Regents of Univ. of Wisconsin System*, 288 F. 3d 296 (7th Cir. 2002) (employer's layoff expert failed to look at terminations to see if discrimination might be involved).

## III.     CONCLUSION

DLR's theory that Diana's efforts to obtain payment on behalf of DLR was some sort of financial scheme belies common sense, given the importance to Diana to retain her employment and health coverage due to her cancer diagnosis and treatment. Instead, DLR merely seeks to cover up its discriminatory and retaliatory motivation behind Diana's termination. Because issues of fact exist, DLR's motion for summary judgment should be denied.

Respectfully submitted,

*/s/ Kami D. Brauer*_____
KAMI D. BRAUER (#0071030)
STUART G. TORCH (#0079667)
EMPLOYMENT LAW PARTNERS, LLC
4700 Rockside Road, Suite 530
Independence, Ohio 44131
(216) 382-2500 (Phone); (216) 381-0250 (Fax)
Email: kami@employmentlawpartners.com
        stuart@employmentlawpartners.com

*Counsel for Plaintiff Diana Gondeau-Guttu*

**CERTIFICATE OF COMPLIANCE**

It is hereby certified that this memorandum in opposition to summary judgment complies with the requirements set forth in Local Rule 7.1(f), for cases assigned to the standard track.

November 13, 2025             */s/ Kami D. Brauer*
Date                          One of the Attorneys for Plaintiff Diana Gondeau-Guttu

**CERTIFICATE OF SERVICE**

It is hereby certified that the foregoing PLAINTIFF GUTTU'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT has been served on all parties via the Court's electronic filing system.

November 13, 2025             */s/ Kami D. Brauer*
Date                          One of the Attorneys for Plaintiff Diana Gondeau-Guttu